Cheryl HUTCHINSON, Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,
A corporation, Defendant.

No. C 93–4018.

United States District Court,
N.D. Iowa,
Western Division.

April 26, 1995.

380

Dennis McElwain of Smith, McElwain & Wengert, Sioux City, IA, for plaintiff Cheryl Hutchinson.

Kenneth Butters of Dreher, Simpson & Jenson, P.C., Des Moines, IA, for UPS.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ................ 382

II. STANDARDS FOR SUMMARY JUDGMENT ......................... 383

III. FINDINGS OF FACT ............................................ 385
 A. Undisputed Facts ................................................ 385
 B. Disputed Facts ................................................ 386

IV. LEGAL ANALYSIS ......................................... 387
 A. Disability Discrimination Under Federal Law........................ 387
 1. The Origins Of The ADA...................................... 387
 2. Disability Discrimination Under The ADA......................... 390
 a. Analytical framework for ADA claims · · 393
 b. The prima facie case under the ADA 393
 3. Hutchinson's Qualification For ADA Protection .:................. 395
 B. Per Se Violations Of The ADA ..................................... 396
 1. What constitutes a per se violation of the ADA? ................ 396
 2. May Hutchinson assert a per se violation? ....................... 397
 C. Disability Discrimination Under Iowa Law ......................... 399
 1. Protected disability.......................................... 400
 2. Qualified for the position ....................................... 401
 3. Remaining elements of the prima facie case..................... 402

V. CONCLUSION ................................................. 402

Who may benefit from the protections of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, appears to this court to be the most frequently encountered question in the comparatively short life of the ADA. In this lawsuit, the plaintiff employee asserts that she is sufficiently disabled to pursue claims under the ADA as the result of a single restriction on her activities, or on the basis of the cumulative effect of several restrictions, while her employer asserts that the plaintiff currently has no impairment or combination of impairments precluding her from a broad range of employment opportunities, and thus is not sufficiently disabled to come within the ADA's protective umbrella.

In addition to consideration of the now-typical threshold question, "Is the plaintiff disabled enough to seek relief under the ADA?", this case presents the comparatively rare question, "Can the plaintiff challenge certain of the employer's policies and practices alleged to be *per se* violations of the ADA?" A related matter for the court to resolve is whether the answer for the plaintiff to the first question must be "yes" before the plaintiff even gets to ask the second question.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Cheryl Hutchinson filed her complaint in this matter on February 10, 1993, against her employer, defendant United Parcel Service (UPS), alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Iowa Code § 216.6. Hutchinson was a package delivery car driver for UPS, and has never been terminated from that position. Hutchinson alleges that she suffered injuries on or about November 29, 1990, again on or about November 29, 1990, and a third time on or about June 3, 1991, as the result of which she was placed under certain restrictions by treating physicians. However, she alleges that since about August 10, 1992, she has offered her continued services to UPS, but UPS has refused to return her to active employment.

UPS answered Hutchinson's complaint on March 8, 1993, asserting as an affirmative defense that all of its actions with respect to Hutchinson's return to work were based on bona fide occupational requirements and business necessity. By consent of the parties, UPS amended its answer on February 7, 1994, but the answer was merely to conform to facts. UPS moved for summary judgment on January 3, 1995, and Hutchin-

son resisted the motion on February 21, 1995. UPS then filed a reply to Hutchinson's resistance on March 1, 1995.

UPS has moved for summary judgment on the ground that Hutchinson does not have a disability within the meaning of either the ADA or Iowa Code § 216.6. Specifically, UPS argues that Hutchinson has no impairment or combination of impairments that causes her to be substantially limited in any major life activity, or in the specific major life activity of "working." UPS also asserts that Hutchinson has received a medical release to return to work, but she has refused to do so, even though she has been offered reinstatement to her former position.

Hutchinson asserts that there are genuine issues of material fact precluding summary judgment in this case. Hutchinson asserts that she is disabled within the meaning of both the ADA and Iowa Code § 216.6, and furthermore, that she has been prevented from returning to work by a UPS policy which requires her to be "100% healed" prior to a return to work. She asserts that such a policy is a *per se* violation of the ADA. Hutchinson also asserts that another UPS policy is a *per se* violation of the ADA, because it provides for accommodation of employees with "work-related" restrictions, but requires that employees with "non-work-related" restrictions be "100% healed" before they can return to the workforce. Thus, Hutchinson asserts that there is a genuine issue of fact as to whether UPS has reasonably accommodated her disabilities.

The court held oral arguments on UPS's motion for summary judgment on April 20, 1995. Hutchinson was personally present at the oral arguments, and was represented by counsel Dennis McElwain of Smith, McElwain & Wengert in Sioux City, Iowa. UPS was represented at the oral arguments by counsel Kenneth Butters of Dreher, Simpson & Jenson, P.C., in Des Moines, Iowa. The oral arguments were animated, effective, informative, and of considerable assistance to the court in its deposition of this motion. In ruling on this motion, the court will first examine the standards for disposition of a motion for summary judgment, then turn to the merits of UPS's motion.

## II. STANDARDS FOR SUMMARY JUDGMENT

■■■ The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir.1992).

■■■ The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S.*

*Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Hutchinson, and give Hutchinson the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■ Procedurally, the moving party, here UPS, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). UPS is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

■ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Hutchinson is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

■ In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Hutchinson fails to make a sufficient showing of an essential element of a claim with respect to which she has the

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d at 394.

burden of proof, then UPS is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the defendants' motions for summary judgment.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244. With these standards in mind, the court turns to consideration of what facts are undisputed, and which are disputed, in this matter.

## III. FINDINGS OF FACT

### A. Undisputed Facts

The record reveals that the following facts are undisputed. Cheryl Hutchinson began

working for UPS as a package delivery car driver on April 17, 1990, and she has never been discharged from that position. Hutchinson is a member of the Teamsters Union, and according to the Essential Job Functions for her position, as negotiated in the contract between UPS and the Teamsters Union effective until July 31, 1993, Hutchinson's job at UPS required her to

> bend, stoop, crouch, climb, stand, sit, walk, and turn/pivot for up to 9.5 hours per day, 5 days per week and lift, lower, push, pull and carry up to 70 pounds with an average weight of the package being 11 pounds, . . .

A new Teamsters contract, which became effective August 1, 1994, increases the lifting requirement to 150 lbs., but provides that a package car driver is entitled to assistance in lifting any package weighing between 70 and 150 lbs.

Hutchinson alleges injuries on three occasions during her employment with UPS. UPS does not dispute that Hutchinson has suffered these injuries, but has from time to time disputed whether the injuries occurred in the course of Hutchinson's employment. On November 29, 1990, Hutchinson suffered a knee injury. On June 29, 1990, Hutchinson suffered upper back and left shoulder injuries when her package delivery car was struck by another vehicle while she was in the back sorting packages. On June 3, 1991, Hutchinson suffered her most severe injuries when her delivery truck slipped into the ditch on a muddy road and rolled onto the driver's side. Hutchinson suffered reinjury to her left shoulder and back as the result of this accident. Hutchinson became an "inactive" employee on August 10, 1992, and has not returned to work at UPS as a package delivery car driver since that date,[2] although UPS has always had such a position available for her.

During her recuperation from the June 3, 1991, accident, Hutchinson was placed on various medical restrictions. On June 28, 1993, Dr. Anil Agarwal placed a lifting re-

---

**2.** At some time during her recuperation, Hutchinson made an abortive attempt to return to light duties at UPS, cleaning trucks, but she found that she was physically unable to continue with those duties.

striction of no more than 30 to 35 lbs on Hutchinson. Dr. Agarwal stated his belief that Hutchinson could not meet the 70 lbs. lifting requirement, because she had been off work for two years. However, it was his opinion that within 6 to 8 weeks of the date of his opinion letter, Hutchinson would be able to meet the 70 lbs. lifting requirement. Dr. Agarwal assessed no permanent disability to Hutchinson for the body as a whole, a 2% permanent disability to the upper extremities as the result of shoulder tendinitis, and no disability to the lower back.

Hutchinson did not consult a doctor between June 28, 1993, and November 17, 1994, when, at the insistence of UPS, she again saw Dr. Agarwal. Dr. Agarwal's opinion was that Hutchinson could fulfill the 70 lbs. lifting requirement and should therefore be able to return to work. His disability rating at this time was the same as otherwise stated in his June 28, 1993, assessment. UPS therefore requested that Hutchinson return to her position as a package delivery car driver. Hutchinson refused, on the ground that she had inadequate assurances that she would not have to lift more than 70 lbs. and that she was unable to do so alone owing to her disability.

Hutchinson has not been terminated by UPS, but since December 13, 1993, has pursued alternative employment with Gateway 2000. Hutchinson works for Gateway 2000 as a production-assembly worker at a position that involves standing for up to 9 hours per day, 6 days per week, for a total of 45 hours or more per week. Her position with Gateway 2000 requires her to lift up to 70 lbs. upon occasion.

### B. Disputed Facts

Hutchinson asserts that the following facts are both disputed and material to this lawsuit. She asserts that she has serious, well-documented impairments, and that UPS has refused to allow her to return to work even when medical restrictions were lifted. She asserts that she was instead required to be "100% healed" before she would be allowed to return to work. She points to three interim reports by Dr. Agarwal indicating that she could return to full or light duties with

UPS. Those reports are, in pertinent part, as follows:

10/18/91: "Therefore, the only way progress will be made is if she can return to light duty. I believe she can return to any light duty work as tolerated with no specific restrictions. However, she may avoid lifting over 30 pounds at this point and avoid prolonged bending or stooping. These restrictions are temporary. I think that she can gradually return to regular duty."

8/24/92: "This patient can return to work lifting up to 30 pounds initially which can be gradually increased starting 8/24/92."

6/28/93: "[G]radually I anticipate these restrictions can be lifted and she can be returned to full-duty with lifting up to 70 pounds. I do not believe she can return to a delivery driver job with UPS as of today because of at least a 70 pound lifting requirement. However, eventually, that is within six to eight weeks, she should be able to do so."

Despite these assertions by a treating physician that Hutchinson could return to work with some, temporary modification of her duties, Hutchinson asserts that UPS has refused to allow her to return to work because she was not 100% healed.

At oral arguments counsel for UPS conceded that at one time there had been a "100% healed" policy for return to work at UPS, but that, upon advice of counsel, UPS had dropped any such policy. Hutchinson asserts that there is a genuine issue of material fact as to whether or not such policy is still being employed by UPS managers despite the advice of counsel on the basis of recent testimony of UPS officials.

Hutchinson also asserts that UPS has a "Temporary Alternative Work" program or TAW involving light duties, but that she has been refused a position under this program, because UPS determined that her injury was not job-related. Hutchinson asserts, again on the basis of deposition testimony by a UPS official, that UPS only makes the TAW program available to people with job-related injuries, not for other disabled employees or applicants.

Hutchinson also asserts that the new Teamsters contract does not make it an essential function of her position to. lift up to 150 lbs. unassisted, but that UPS has regarded that unassisted lifting requirement to be an essential function of her position which bars her from returning to work. She asserts that she could have met the requirement of lifting 70 . lbs. with minimal or no accommodation from approximately October of 1991. She·also asserts that UPS has other positions available that do not have lifting requirements beyond her abilities, but that UPS has refused to make such positions available to her.

## IV. LEGAL ANALYSIS

Hutchinson has brought her disability discrimination claims under both federal and state law. Her federal disability discrimination claim is based on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* Her state-law disability claim is brought pursuant to Iowa Code Ch. 601A, now Ch. 216. The court will consider the federal claim first, then turn to the state-law claim.

### A. Disability Discrimination Under Federal Law

Before turning to the merits of Hutchinson's claim under the ADA, the court believes it is beneficial to place it in the context of Congress' endeavors to combat discrimination based on disabilities. Then the court may consider whether Hutchinson comes under the protective umbrella Congress has designed.

### 1. The Origins Of The ADA

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring,

advancement or discharge of employees...." 42 U.S.C. § 12112. This language of the ADA is substantially identical to that of the Rehabilitation Act, 29 U.S.C. § 794, which forbids discrimination "by reason of his handicap." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995).

The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794: *Helen L. v. DiDario,* 46 . F.3d 325, 329 (3d Cir.1995) (describing in detail the history of Congressional efforts to attack disability discrimination). Congress and the Executive found that section 504 of the prior act simply was not working as a means of eradicating discrimination and segregation in this country. For example, Congress found that, even though section 504 had been the law for seventeen years,

> society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

42 U.S.C. § 12101(a)(2). Because Congress found further that public officials historically have been among the major perpetrators of segregated services in this country, *see* Timothy M. Cook, *The Americans With Disabilities Act: The Move To Integration,* 64 TEMP. L.REV. 393, 400, 416 (identifying state laws mandating segregation of persons with disabilities and suggesting an analogy with the "Jim Crow laws" mandating racial discrimination), Title II of the ADA, 42 U.S.C. §§ 12131–12134, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act, but extends them to state and local governments. *Helen L.,* 46 F.3d at 331; *Easley v. Snider,* 36 F.3d 297, 300 (3d Cir.1994).[3] Section 202 of Title II provides as follows:

---

**3.** These ˙congressional findings are similar to those of Justice Stevens and Justice Marshall in their concurrences in *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), a case involving discrimination against the mentally retarded. Justice Stevens found that "through ignorance and prejudice the mentally retarded ʿhave been subjected to a history of unfair and often grotesque mis-

treatment.' " *Cleburne,* 473 U.S. at 454, 105 ·S.Ct. at 3262 (Stevens, J., concurring). Similarly, Justice Marshall found that ˙

> [a] regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The ADA was not the first attempt to address the limitations of existing legislation to eradicate discrimination on the basis of disabilities. Periodically through the mid-1980s there had been attempts to amend the Civil Rights Act of 1964 to include people with disabilities. See, e.g., H.R. 370, 99th Cong., 1st Sess. (1985). In 1983, the United States Commission of Civil Rights observed that "[h]andicap discrimination and, as a result, its remedies differ in important ways from other types of discrimination and their remedies," therefore disability rights laws explicitly modelled on prior civil rights statutes were not necessarily effective. U.S. COMM'N ON CIVIL RIGHTS, ACCOMMODATING THE SPECTRUM OF INDIVIDUAL ABILITIES 48, 149 (1983). A federal judge had a more blunt assessment:

> [T]he Title VII and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different undertaking.
>
> Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole....

Garrity v. Gallen, 522 F.Supp. 171, 206 (D.N.H.1981). Another commentator identified more specific weaknesses of prior laws that attempted to address disability discrimination:

> Problems involved in trying to transfer principles and legal analysis developed in race and sex discrimination cases wholesale to disability discrimination were interwoven with other difficulties and shortcomings of disability nondiscrimination statutes prior to the ADA. Experience with

the application of such prior statutes, including section 504 of the Rehabilitation Act of 1973, uncovered or highlighted weaknesses of such laws arising from their statutory language, the limited extent of their coverage, inadequate enforcement mechanisms, and erratic judicial interpretations. Legal commentators have extensively described and lamented the flaws in the working, interpretation, and implementation of federal disability nondiscrimination statutes prior to the ADA.

Robert L. Burgdorf, Jr., The Americans With Disabilities Act: Analysis And Implications Of A Second-Generation Civil Rights Statute, 26 Harv.C.R.–C.L.L.Rev. 413, 430–31 (1991) (footnotes omitted).

In enacting the ADA, Congress found that "[h]istorically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Helen L., 46 F.3d at 332. The purpose of the ADA in light of this history of discrimination was summarized by Congressman Dellums:

> The history of different, separate, and unequal treatment of persons with disabilities, especially those with severe disabilities, could not be clearer. That history is in fact a stark reminder of the prejudice and misunderstanding that has characterized the treatment of minority citizens. This disparate treatment establishes an abundant factual predicate for the relief granted by [the ADA]. The Americans With Disabilities Act is a plenary civil rights statute designed to halt all practices that segregate persons with disabilities and those which treat them inferior [sic] or differently. By enacting the ADA, we are making a conscious decision to reverse a sad legacy of segregation and degradation.

136 CONG.REC. H2599 (daily ed. May 22, 1990) (statement of Rep. Dellums). Almost ten years earlier, a disabled legal scholar and disability rights advocate had written that

the retarded and "nearly extinguish their race." Retarded children were categorically excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect nonretarded

children from them. State laws deemed the retarded "unfit for citizenship."

Id. at 462–63, 105 S.Ct. at 3266 (Marshall, J., concurring) (footnotes omitted).

[t]he history of society's formal methods for dealing with handicapped people can be summed up in two words: segregation and inequality. Individuals with handicapping conditions have faced an almost universal conspiracy to shunt them aside from the mainstream of society and to deny them an equal share of benefits and opportunities available to others.... At every juncture, the handicapped person has met with attempts to "push" him or her aside and to withhold that which is taken for granted from other persons.

Robert L. Burgdorf, Jr., THE LEGAL RIGHTS OF HANDICAPPED PERSONS: CASES, MATERIALS, AND TEXT 51 (1980).

Before passing the ADA, Congress conducted fourteen hearings at the Capitol, and another sixty-three field hearings, and reviewed hundreds of discrimination diaries submitted for the legislative record by persons with disabilities. AMERICANS WITH DISABILITIES ACT OF 1989: HEARINGS ON S. 933 BEFORE THE SENATE COMM. ON LABOR AND HUMAN RESOURCES AND THE SUBCOMM. ON THE HANDICAPPED. 101st Cong., 1st Sess. (1989) (testimony of Justin Dart, Chairman of Task Force on Rights and Empowerment of Americans with Disabilities). Congress was confronted with testimony that

[b]y almost any definition, Americans with disabilities are uniquely underprivileged and disadvantaged. They are much poorer, much less well educated and have much less social life, have fewer amenities and have a lower level of self-satisfaction than other Americans.

SENATE SUBCOMM. ON THE HANDICAPPED, S. Hrg. 166, pt. 2, at 9 (1987) (statement of Humphrey Taylor); quoted in S.REP. NO. 116, 101st Cong., 1st Sess. 8 (1989); also quoted in H.R.REP. NO. 485, 101st Cong., 2d Sess., pt. 2, at 31, 1990 U.S.Code Cong. & Admin.News, pp. 267, 312, 313 (1990). Congress found that its hearings, investigations, and other sources revealed severe prejudice and discrimination towards disabled persons persisted in this country: Persons with disabilities, especially those with severe, noticeable disabilities, were told outright that they had been excluded because others would feel uncomfortable around them. *See, e.g.,* S.REP.

No. 116, 101st Cong., 1st Sess. 7 (1989), and H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 30, U.S.Code Cong. & Admin.News 1990, pp. 267, 311 (1990) (a New Jersey zoo keeper refused to admit children with Down's syndrome because he feared they would upset the chimpanzees; and, from remarks of Rep. Vanik, citing as an example of discrimination on the basis of disability from *Alexander v. Choate,* 469 U.S. 287, 307 n. 29, 105 S.Ct. 712, 723 n. 29, 83 L.Ed.2d 661 (1985), a child with cerebral palsy was excluded from public school, although he was academically competitive and his condition was not actually physically disruptive, because his teacher claimed his physical appearance "produced a nauseating effect" on his classmates); 135 CONG.REC. S10720 (daily ed. Sept. 7, 1989) (statement of Sen. Durenberger) (applicant with cerebral palsy described being told she was not qualified for job in metropolitan hospital because fellow employees would not be comfortable working with her); SENATE COMM. ON LABOR AND HUMAN RESOURCES, REP. ON THE AMERICANS WITH DISABILITIES ACT, S.Rep. No. 116, 101st Cong., 1st Sess. 7 (1989) (applicant "crippled by arthritis" denied employment in higher education because "college trustees [thought] 'normal students' shouldn't see her"); HOUSE COMM. ON EDUCATION AND LABOR, REP. ON THE AMERICANS WITH DISABILITIES ACT, H.R.Rep. No. 485, 101st Cong., 2d Sess., at 42, reprinted in 1990 U.S.CODE CONG. & ADMIN.NEWS pp. 267, 303, 324 (1990) (testimony of Virginia Domini) ("[T]he general public doesn't want to see you doing your laundry, being a case worker, a shopper, or a Mom. It is difficult to see yourself as a valuable member of society, and sometimes it is hard to see yourself as a person worthy of so much more respect than you get from the general public.").

Various draft bills to combat disability discrimination were introduced in 1988, and Congressional hearings followed. H.R. 4498, 100th Cong., 2d Sess., 134 CONG.REC. E1307 (daily ed. April 29, 1988); S. 2345, 100th Cong., 2d Sess., 134 CONG.REC. S5110 (daily ed. April 28, 1988). A revised ADA bill was introduced in the 101st Congress on May 9, 1989. S. 933, 101st Cong., 1st Sess., 135 CONG.REC. S4978 (daily ed. May 9, 1989); H.R. 2273, 101st Cong., 1st Sess., 135 CONG.

REC. H1690 (daily ed. May 9, 1989). The House and Senate versions were eventually reported out of committees, the House version was passed on May 22, 1990, by a vote of 403 to 20. 136 CONG.REC. H2638 (daily ed. May 22, 1990). Following conferences on differences between the House and Senate versions, the House approved the final version of the bill by a vote of 377 to 28 on July 12, 1990, 136 CONG.REC. H4629 (daily ed. July 12, 1990), and the following day the Senate passed the ADA by a vote of 91 to 6. 136 CONG.REC. S9695 (daily ed. July 13, 1990).

In the final form of the ADA, Congress concluded that "[i]ndividuals with disabilities continually encounter various forms of discrimination...." 42 U.S.C. § 12101(a)(5). *Helen L.*, 46 F.3d at 332. In furtherance of the objective of eliminating discrimination against the disabled, Congress stated that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8); *Helen L.*, 46 F.3d at 332. Thus, the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir.1995). In his remarks to more than 3000 people, most of whom had disabilities, gathered on the South Lawn of the White House for the signing ceremony, President Bush described the ADA as an "historic new civil rights Act ...[,] the world's first comprehensive declaration of equality for people with disabilities." President George Bush, Remarks by the President During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26, 1990) (on file with the Harvard Civil Rights–Civil Liberties Law Review), quoted in Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute*, 26 Harv.C.R.–C.L.L.Rev. 413 (1991). Title I of the ADA, prohibiting discrimination in employment on the basis of a disability, became effective on July 26, 1992. Pub.L. 101–336, § 108 ("This title [subchapter] shall become effective 24 months after the date of enactment [July 26, 1990].").

With this historical context for the ADA as background, the court may now turn to the standards it is to apply in answering the threshold question in ADA litigation, "Is the plaintiff disabled enough to seek relief under the ADA?"

### 2. Disability Discrimination Under The ADA

Under the ADA, "disability" is broadly defined to include not only "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual," but also "ha[ving] a record of such an impairment," or the state of "being regarded as having such an impairment." 42 U.S.C. §§ 12102(2)(A), (B), (C); *Vande Zande*, 44 F.3d at 541; *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) ("disability" under ADA means a condition that "substantially limits" major life activity). In seeking further definition of the term "substantially limits" under the ADA, the First Circuit Court of Appeals looked to the regulations implementing the ADA:

> Those regulations indicate that the question of whether an impairment is substantially limiting turns on '(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact ... of, or resulting from, the impairment.' 29 C.F.R. § 1630, App. at 403 (1992).

*Cook v. State of R.I. Dep't of Mental Health, Retardation, and Hospitals*, 10 F.3d 17, 25 n. 10 (1st Cir.1993). ADA regulations, as well as ADA interpretive guidance, make clear that temporary, minor injuries do not "substantially limit" a person's major life activities. 29 CFR §§ 1630.2(j), 1630 App., at 407.

The Seventh Circuit Court of Appeals found the third prohibition, that the employer regards the employee as disabled, fits with the goals of the ADA, because "[m]any such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise

shunned as a consequence." *Vande Zande,* 44 F.3d at 541. The Fifth Circuit Court of Appeals surveyed decisions in which courts considered the issue of how limiting an employer must consider an employee's impairment to be before the employer is held to regard the employee as disabled under the Rehabilitation Act and other acts prohibiting discrimination on the basis of a disability. *Chandler,* 2 F.3d at 1391–93. The court noted that in *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986),

> [t]he Fourth Circuit held that the employer did not regard the employee as handicapped simply because it found that he could not meet the demands of this particular job. "The statutory reference to a substantial limitation indicates instead that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved."

*Chandler,* 2 F.3d at 1392 (quoting *Forrisi,* 794 F.2d at 934). The court next observed that in *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249–50 (6th Cir.1985), the court concluded that the employer had not regarded the employee as handicapped because his eyesight prevented his driving, because "[a]n impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." *Id.* (quoting *Jasany,* 755 F.2d at 1249 n. 3). The court then turned to one of its prior unpublished decisions in which it had that the employer's perception that the employee could work in positions other than the one he had formerly occupied despite his impairment was evidence that the employer did not regard the employee as handicapped, again emphasizing that the employee was not regarded as being substantially limited in a major life activity or in performing work-related functions in general. *Id.* at 1392–93. From this survey, the court concluded that the rule is that

> [a]n employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee

as having a substantial limitation on [the employee's] ability to work in general. *Id.* at 1393.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995) (citing this definition from the ADA); *Tyndall v. National Educ. Ctrs,* 31 F.3d 209, 212 (4th Cir.1994); *and compare School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (similar definition in Rehabilitation Act, 29 U.S.C. § 794(a)); *Southeastern Comm. College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (Rehabilitation Act definition). Similarly, the ADA reaches beyond protection of people with disabilities irrelevant to performance of their jobs by defining "discrimination" as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." *Vande Zande,* 44 F.3d at 541–42 (quoting 42 U.S.C. § 12112(b)(5)(A)). To put it another way, although the ADA prohibits discharge of a person "because of" a disability, an "employer may fire [an] employee because he cannot perform his job adequately, i.e., he is not a 'qualified individual' within the meaning of the ADA." *Hedberg,* 47 F.3d at 934 (citing 42 U.S.C. § 12111(8)). But before firing such an employee, the employer must consider whether "reasonable accommodation" can be made. *Id.; Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538 (7th Cir.1995).

The Fifth Circuit Court of Appeals has formulated a two-pronged test of whether a person is "qualified" within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear

more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable [the individual] to perform those functions.

*Chandler,* 2 F.3d at 1393–94; *see also White,* 45 F.3d at 361–62 (quoting and applying the *Chandler* test of "qualified"); *Tyndall,* 31 F.3d at 213 (citing and applying the *Chandler* test).

■ There are, of course, limits upon what accommodation is required under the ADA:

The ADA does not, for example, necessarily insulate from discharge someone whose underlying disability causes him to be frequently drunk on the job. The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face. *See* 42 U.S.C. § 12101(a).

*Hedberg,* 47 F.3d at 934. Under the terms of the statute, the accommodation must be "reasonable" and must not impose "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Vande Zande,* 44 F.3d at 542. In *Vande Zande,* the court considered first what was meant by "reasonable accommodation," then considered the meaning of "undue hardship":

To "accommodate" a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So "reasonable" may be intended to qualify (in the sense of weaken) "accommodation," in just the same way that if one requires a "reasonable effort" of someone this means less than the maximum possible effort.... It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthy ... that it may not be able to

plead "undue *hardship*," it would not be required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee....

[One could argue that] the function of the "undue hardship" safe harbor, like the "failing company" defense in antitrust liability ... is to excuse compliance by a firm that is financially distressed, even though the cost of the accommodation to the firm might be less than the benefit to disabled employees.

[However, t]his interpretation of "undue hardship" is not inevitable—in fact probably is incorrect. It is a defined term in the Americans with Disabilities Act, and the definition is "an action requiring significant difficulty or expense," 42 U.S.C. § 12111(10)(A).

*Vande Zande,* 44 F.3d at 542–43. The court therefore concluded that costs and difficulties to the employer, in light of the employer's financial health or survival, and the benefits to the employee were both relevant to the "reasonable accommodation" inquiry. *Id.*

The conclusions of the court in *Vande Zande* concerning the extent of the required accommodation are reinforced by the legislative history of the ADA itself on this point. The report of the House Committee on Education and Labor states:

The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA v. Hardison,* 432 U.S. 63 [97 S.Ct. 2264, 53 L.Ed.2d 113] (1977), are not applicable to this legislation. In *Hardison,* the Supreme Court concluded that under Title VII of the Civil Rights Act of 1964 an employer need not accommodate persons with religious beliefs if the accommodation would require more than a de minimis cost for the employer. By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of "requiring significant difficulty or expense" on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison.* This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaning-

ful employment opportunities for people with disabilities.

H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 2, at 68, 1990 U.S.Code Cong. & Admin.News, pp. 267, 350 (1990); *see also* H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 3, at 40, 1990 U.S.Code Cong. & Admin.News, pp. 267, 462 (1990); S.REP. No. 101–116, 101st Cong., 1st Sess. 36 (1989).

### a. Analytical framework for ADA claims

 To qualify for relief under the ADA, a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse decision, "because of" the plaintiff's disability. *White,* 45 F.3d at 361; *Mason v. Frank,* 32 F.3d 315, 318–19 (8th Cir.1994); *Tyndall,* 31 F.3d at 212; *Chandler,* 2 F.3d at 1390; *Gilbert v. Frank,* 949 F.2d 637, 640–42 (2d Cir.1991); *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990). The analytical framework employed by courts confronted with claims pursuant to the ADA has generally been the familiar *McDonnell Douglas* shifting burdens analysis. *See, e.g., White,* 45 F.3d at 361; *Aikens v. Banana Republic, Inc.,* 877 F.Supp. 1031, 1036–37 (S.D.Tex. 1995); *West v. Russell Corp.,* 868 F.Supp. 313, 316 (M.D.Ala.1994).[4]

### b. The prima facie case under the ADA

Although courts have applied the *McDonnell Douglas* framework with some consistency, this court finds that the circuit courts of appeals have been somewhat reluctant to articulate the proper *prima facie* case for

**4.** All of the cases cited below as grappling with the question of the proper *prima facie* case under the ADA also naturally assume that the *prima facie* case is part of a *McDonnell Douglas* analysis. The court has only cited here cases that contain some discussion of the propriety of applying this analysis to an ADA claim.

The analytical framework of shifting burdens referred to in the body of this opinion was developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Community Affairs*

ADA claims with which to begin the analysis. In *Hedberg,* the Seventh Circuit Court of Appeals considered, without deciding,[5] the elements of a *prima facie* case under the ADA. *Hedberg,* 47 F.3d at 933 n. 5. The court confined itself to the question of what role the employer's knowledge of the plaintiff's disabilities would play in the plaintiff's *prima facie* case where those disabilities are not obvious. *Id.*

The court concluded first that where the employer did not know of the plaintiff's disabilities, the employer could not have discharged the plaintiff "because of" the disability. *Id.* at 933. The court in *Hedberg* identified a number of courts that had come to similar conclusions under the ADA or analogous statutes designed to prevent disability discrimination. *Id.; see also Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178 (6th Cir.1993) (where employer knew nothing of handicap, employer could not be liable under the Rehabilitation Act); *Mazzarella v. United States Postal Serv.,* 849 F.Supp. 89, 96–97 (D.Mass.1994) (holding that lack of knowledge of decisionmaker who fired an employee with a mental disorder precluded liability under the Rehabilitation Act); *Grinstead v. Pool Co. of Texas,* 1994 WL 25515 (E.D.La.1994) (holding that there can be no liability under the ADA for firing a worker with a 20% disability rating when the plaintiff produced no evidence that the employer knew of the disability); *aff'd without op.,* 26 F.3d 1118 (5th Cir.1994); *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 358–59 (N.D.Tex.1994) (holding that there could be no liability under Texas human rights law that forbade discharge "because of disability" for employer's discharge of mentally ill employee, where plaintiff produced no evidence that the employer knew of the disability); *Dutson v.*

*v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1108 (8th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994).

**5.** The court stated, "We need not decide the precise elements of a *prima facie* case of discrimination under the ADA." *Hedberg,* 47 F.3d at 933, n. 5.

*Farmers Ins. Exchange,* 815 F.Supp. 349, 352 (D.Or.1993) (holding that where there was no evidence that an employer knew of its employee's being HIV-positive, the employer could not have illegally discriminated against the employee), *aff'd without op.,* 35 F.3d 570 (9th Cir.1994); *O'Keefe v. Niagara Mohawk Power Corp.,* 714 F.Supp. 622, 627 (N.D.N.Y. 1989) (holding that there could be no liability under New York human rights law, forbidding discharge "because of disability," where there was no genuine issue of material fact that those who decided to fire the plaintiff knew nothing of his alcoholism).

> The court in *Hedberg* also concluded that Where disabilities are not obvious, it may be that part of the plaintiff's *prima facie* case would be to demonstrate knowledge of the disability on the employer's part, as is necessary for Title VII religious discrimination. *See Beasley [v. Health Care Serv. Corp.],* 940 F.2d [1085] 1088 [ (7th Cir. 1991) ]; *Redmond [v. GAF Corp.],* 574 F.2d [897] 901–02 [ (7th Cir.1978) ]. All we decide today, however, is that where there is no genuine issue that an employer did not know of an employee's disability when it decided to fire him, the employee cannot make out a case of discriminatory discharge.

*Hedberg,* 47 F.3d at 933 n. 5. The court rejected that notion that an employee fired because of "symptoms" of his disability has been fired "because of" the disability where those "symptoms" may have any number of sources other than disability, remarking that "[t]he ADA does not require clairvoyance." *Id.* at 933. Only if the employer knows of the disability, or if the "symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," do the provisions of the ADA become binding. *Id.* Similarly, where the disability discrimination plaintiff fails to establish that he or she was treated differently from other persons, the plaintiff has failed to establish one element of a *prima facie* disability discrimination case, and no further inquiry is needed. *Owens v. United States Postal Serv.,* 37 F.3d 1326, 1328 (8th Cir. 1994).

However, finding themselves in the quandary of being left without precise guidance from the circuit courts of appeals articulating the proper *prima facie* case for an ADA plaintiff, the district courts have hit upon two possible formulations, as demonstrated by a sampling of recent ADA decisions. In one group are those courts that apply a *prima facie* case that is indistinguishable from the elements of an ADA case as described above: a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse decision, "because of" the plaintiff's disability. *See, e.g., Ricks v. Xerox Corp.,* 877 F.Supp. 1468 (D.Kan.1995); *Howe v. Hull,* 873 F.Supp. 72, 78 (N.D.Ohio 1994). In another group are those courts applying a *prima facie* case more obviously adapted from the one used in other employment discrimination cases: the plaintiff must establish (1) that he or she is disabled within the meaning of the ADA; (2) he or she is a "qualified individual" within the meaning of the ADA; (3) the plaintiff was subject to an adverse employment decision; and (4) the plaintiff was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *See, e.g., Zambelli v. Historic Landmarks, Inc.,* 1995 WL 116669 (E.D.Pa.1995); *Aikens v. Banana Republic, Inc.,* 877 F.Supp. 1031, 1036–37 (S.D.Tex. 1995); *Rogers v. International Marine Terminals, Inc.,* 1995 WL 16787, *3 (E.D.La. 1995); *Aucutt v. Six Flags Over Mid–America, Inc.,* 869 F.Supp. 736 (E.D.Mo.1994); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994); *West v. Russell Corp.,* 868 F.Supp. 313, 317 (M.D.Ala.1994).[6] Other courts, without deciding the precise formulation of the *prima facie* case have held that failure to make

---

**6.** Courts using both formulations of the *prima facie* case cite *White,* 45 F.3d at 361, as supporting their formulation of the test, which is indicative of the uncertainty created by the silence of the circuit courts of appeals on this issue.

some specific showing meant that the plaintiff could not establish a *prima facie* case. *See, e.g., Jeanine B. v. Thompson,* 877 F.Supp. 1268 (E.D.Wis.1995) (failure to allege that plaintiffs were disabled persons was fatal to *prima facie* case under ADA and Rehabilitation Act); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 554 (D.Kan. 1995) (although defendant asserted plaintiff could not show any of the elements of a typical discrimination claim, the court found plaintiff had failed to establish a *prima facie* case because the plaintiff could not show that she was a "qualified individual with a disability").

██ This court agrees with those decisions holding that the proper *prima facie* case under the ADA is that most closely resembling the *prima facie* showing required for other forms of employment discrimination: the plaintiff need not show at the *prima facie* case phase that he or she was terminated "because of" a disability. Rather, the plaintiff need only make a showing that gives rise to an *inference* of discrimination on the basis of disability. Hence, the plaintiff must show that he or she suffered an adverse employment decision, and that plaintiff was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated, or the plaintiff was treated less favorably than non-disabled employees, those with lesser disabilities, or those whose disabilities are more easily accommodated.

██ The court admits that no other authority has included in its formulation of the *prima facie* case under the ADA the comparison of the plaintiff with persons with lesser or more easily accommodated disabilities. However, the court does not believe that the protections of the ADA come into play only if the disabled plaintiff was replaced by or treated less favorably than a *non*-disabled person, just as in an ADEA case, it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a *younger* person. *Rinehart v. City of Independence, Mo.,* 35 F.3d 1263, 1265–66 (8th Cir. 1994). A plaintiff has been terminated "because of" his or her disability just as surely

where the employer terminates the plaintiff in favor of another who also fits within the ADA's definition of "disable," but whose disability is more cheaply or easily accommodated, as when the plaintiff is terminated in favor of an non-disabled person. If the ADA permitted such substitution of persons with less severe or more easily accommodated disabilities for those with more severe or less easily accommodated ones, it would be creating a scenario wherein employers were permitted to discriminate among members of the ostensibly protected class. The ADA's requirement that accommodation be reasonable already provides sufficient protection to employers from "undue hardship," but preserves the outer limits in defining the class of disabled persons, rather than allowing employers to control whom the ADA protects. The court will return to this point when it considers Hutchinson's allegations that UPS has policies that are *per se* violations of the ADA.

### 3. Hutchinson's Qualification For ADA Protection

██ The court must now address what it has described as the typical or threshold question in an ADA case, "Is Hutchinson disabled enough to seek relief under the ADA?" The court concludes that the answer to this question is "no." Although it is somewhat unclear from Hutchinson's complaint and resistance to the motion for summary judgment, and even following the court's request for clarification of the point during oral arguments, exactly what major life activity Hutchinson claims to be substantially limited by her impairments, the court finds that Hutchinson is not so limited.

Under the applicable regulations, the court is to consider "(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact ... of, or resulting from, the impairment." 29 C.F.R. § 1630, App. at 403 (1992); *see also Cook v. State of R.I. Dep't of Mental Health, Retardation, and Hospitals,* 10 F.3d 17, 25 n. 10 (1st Cir.1993). ADA regulations, as well as ADA interpretive guidance, make clear that temporary, minor injuries do not

"substantially limit" a person's major life activities. 29 CFR §§ 1630.2(j), 1630 App., at 407. Although Hutchinson's injuries were not "minor," the medical record demonstrates that they were temporary, and that any permanent impairment is only slight. Hutchinson acknowledges that she has now recovered sufficiently to meet the 70 lbs. unassisted lifting requirement.

Furthermore, Hutchinson's impairments have not disqualified her from a wide range of jobs. "An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." *Chandler*, 2 F.3d at 1392 (quoting *Forrisi*, 794 F.2d at 934). Hutchinson has only been disqualified from the narrow range of jobs involving unassisted lifting of over 70 lbs. She currently performs work similar to that formerly required of her at UPS, which is proof that she has not been limited in this major life activity.

Nor has UPS regarded Hutchinson as disabled in violation of the ADA. "An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on [the employee's] ability to work in general." *Id.* at 1393. Although UPS may at one time have regarded Hutchinson as unable to perform the package delivery car job because she could not perform the narrow task of lifting packages between 30 and 70 lbs., UPS did not thereby regard her as disabled. Nor does UPS currently regard Hutchinson as disabled at all, because UPS has offered Hutchinson her former position, but Hutchinson has refused to return to work because she believes that she has received inadequate assurances that she will not have to lift packages in excess of 70 lbs. unassisted. Hutchinson is not disabled within the meaning of the ADA, and the court's analysis of Hutchinson's claims to protection of the ADA stops there, without addressing the questions of whether Hutchinson's disability entitles her to reasonable accommodation which UPS has failed to provide. UPS is therefore entitled to summary judgment on Hutchinson's individual claim for relief under the ADA as the result of refusal to allow her to return to work.

## B. Per Se Violations Of The ADA

However, the court's analysis of Hutchinson's claims of violation of the ADA does not end with a determination that Hutchinson is not disabled within the meaning of the Act, because Hutchinson has also asserted that UPS has two policies that are *per se* violations of the Act.[7] These policies are the "100% healed" requirement, which requires that an injured employee cannot return to work until he or she is "100% healed," and the second is the policy providing for differential availability of the "Temporary Alternative Work" or TAW program for persons injured in work-related or non-work-related circumstances.

■ The court believes that a "100% healed" policy, if it exists, would be a *per se* violation of the ADA. Such a policy would on its face "discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Although the availability of the TAW program ostensibly is based on whether or not the applicant was injured in a work-related or non-work-related context, rather than upon the disability itself, such a policy may also run afoul of the ADA. Such a policy may distinguish between persons who have similar or identical disabilities regarding what degree of accommodation such persons receive, and thus discriminate on the basis of disability in the privileges of employment.

### 1. What constitutes a per se violation of the ADA?

Relatively few courts have considered *per se* violations of the ADA as the result of a

---

7. At oral arguments, the court raised *sua sponte* the question of whether Hutchinson could pursue her claims of *per se* violations of the ADA if she was not disabled. The parties appeared to agree that if Hutchinson was not disabled within the meaning of the ADA, she could not pursue her allegations of *per se* violations. Having raised the question *sua sponte*, however, the court feels compelled to answer it with some care rather than leave the parties with the positions they felt required to take when surprised by the question.

defendant's policies or procedures, and some of those have involved Title II of the ADA, which pertains to public entities or public services, rather than Title I, which pertains to employment. *See, e.g., Stillwell v. Kansas City, Mo., Bd. of Police Comm'rs,* 872 F.Supp. 682, 686–88 (W.D.Mo.1995) (under Title II, the public entity provision of the ADA, 42 U.S.C. §§ 12131–12165, a blanket exclusion of one-handed applicants from licensing as police officers was a *per se* violation); *Coleman v. Zatechka,* 824 F.Supp. 1360, 1367–69 (D.Neb.1993) (Title II of ADA "prohibits using assumptions of [disqualification because of disability] rather than facts and conclusions gleaned from individualized inquiry," citing 28 C.F.R. Pt. 35, App. A at 349, and such an assumption "falls far short of the individualized assessment that is required by the ADA."); *Galloway v. Superior Court of Dist. of Columbia,* 816 F.Supp. 12, 18–19 (D.D.C.1993) (Title II of the ADA prohibited assumption that blind persons could not serve on juries, because, with or without reasonable accommodation, blind persons could serve on juries in a number of cases, thus "categorical exclusion of all blind persons from Superior Court juries violates the ADA"); *Anderson v. Little League Baseball, Inc.,* 794 F.Supp. 342, 345 (D.Ariz.1992) (Title III, regarding public accommodations, requires individualized inquiry, and prohibits blanket exclusions, such as the one in question which "amount[ed] to a[n] absolute ban on coaches in wheelchairs in the coachers box, regardless of the coach's disability or the field or game conditions involved. Regrettably, such a policy—implemented without public discourse—falls markedly short of the requirements enunciated in the Americans with Disabilities Act and its implementing regulations.").

Cases involving the employment provisions of the ADA, found in Title I of the Act, include *Bombrys v. City of Toledo,* 849 F.Supp. 1210, 1216–19 (N.D.Ohio 1993). In that case, the district court found that an irrebuttable presumption that an applicant cannot perform the essential functions of the job because of a disability, in this case, insulin-dependent diabetes, violated not only 42 U.S.C. § 12112(a) of Title I of the ADA, but the Fourteenth Amendment. *Bombrys,* 849 F.Supp. at 1216. The court found that the ADA requires a case-by-case assessment of disabilities, and does not permit blanket exclusions. *Id.* Another such case is *Sarsycki v. United Parcel Service,* 862 F.Supp. 336 (W.D.Okl.1994), again involving a blanket policy against hiring insulin-dependent diabetics as drivers. In *Sarsycki,* the court held that under the ADA "individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices." *Sarsycki,* 862 F.Supp. at 341 (quoting *Bombrys,* 849 F.Supp. at 1219). The court finds it unfortunate that one of the defendants found to have a policy that constituted a *per se* violation of the ADA should appear again as a defendant faced with a similar charge in so small a body of cases.

The "100% healed" policy of UPS, as represented by the record here, does not make an individual assessment of an individual's ability to perform the essential functions of the person's job with or without accommodation following injury and resulting permanent disability, but substitutes for this inquiry simply a determination of whether the person is "100% healed" from the injury. Such a policy is a far cry from the requirements of the ADA. Not only does the court believe that the "100% healed" policy of UPS would be a *per se* violation of the ADA, the court finds that there is a genuine issue of material fact as to whether such a policy still exists at UPS, even after UPS has been advised by counsel that such a policy runs afoul of the ADA.

### 2. *May Hutchinson assert a per se violation?*

Notwithstanding the court's umbrage that such a policy could still be contemplated or utilized by an employer, the court finds several reasons why no relief can be afforded for such a *per se* violation in this case. First, the policy has, according to the representations of UPS's counsel, been withdrawn, and UPS is to be applauded for taking appropriate steps to conform its conduct to the law, if the policy has indeed been withdrawn. Withdrawal of the policy would moot any prospective relief the court could grant.

Second, the court finds that in this case, Hutchinson received individualized assessment of her ability to perform the essential functions of her job, and was thereafter invited by UPS to return to her position with assurances of adequate accommodation if necessary. Hutchinson refused that offer. Thus, Hutchinson has not been subjected to a "blanket exclusion," but has received, as the ADA requires, an individualized assessment of her capacity to perform the essential functions of her job.

 Most importantly, however, the court finds that Hutchinson does not have standing to pursue a claim of a *per se* violation of the ADA. In *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983), the Supreme Court held that even a person who had suffered a prior injury could not obtain equitable relief unless there was a showing that there is a "real or immediate threat that the plaintiff will be wronged again in a similar way...." *Coleman v. Watt,* 40 F.3d 255, 259 (8th Cir. 1994). "A speculative or hypothetical claim of future injury is insufficient to generate standing." *Id.* (citing *Shipman v. Missouri Dep't of Social Serv.,* 877 F.2d 678, 681 (8th Cir.1989), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 842, 107 L.Ed.2d 837 (1990)); *see also Sierra Club v. Robertson,* 28 F.3d 753, 757–58 (8th Cir.1994). Without standing, federal courts are without subject matter jurisdiction to entertain a plaintiff's action. *Friedmann v. Sheldon Community Sch. Dist.,* 995 F.2d 802, 804 (8th Cir.1993). Hutchinson does not have standing, because she is not a person with a disability within the meaning of the ADA; therefore, she is not a person who can assert a claim under 42 U.S.C. § 12112(a), nor one who can be wronged by violation of its provisions. Furthermore, there is no real or immediate threat that Hutchinson will become such a person, and therefore she cannot generate standing.[8]

As a final matter, the court must consider whether, notwithstanding the objections above to Hutchinson's pursuit of equitable remedies for *per se* violations of the ADA, the remedial provisions of the ADA establish her standing to pursue that injunctive or declaratory relief. Section 12117 states that the "powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to ... any person alleging discrimination on the basis of disability in violation of any provision of this chapter...." 42 U.S.C. § 12117(a). Section 2000e–5(g) was amended in 1991, Pub.L. 102–166, § 107(b), to provide as follows:

> (B) On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
>> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
>>
>> (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

Section 2000e–2(m) prohibits so-called "mixed motive" discrimination. *See* 42 U.S.C. § 2000e–2(m) (prohibiting discrimination where the plaintiff's protected class was "a motivating factor" for the discrimination). Thus, the amendment provides for injunctive

---

8. In this respect, Hutchinson's claim of *per se* violations also suffers from mootness problems. A plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being injured by the defendant in the future. *Cox v. Phelps Dodge Corp.,* 43 F.3d 1345, 1348 (10th Cir.1994). The *Cox* court noted that "[e]mploying this analysis, we have concluded that a legitimate termination of employment moots a plaintiff's § 1983 claim for declaratory

and/or injunctive relief relating to conditions of the plaintiff's employment," and therefore concluded that a claim for such relief was moot where the plaintiff was no longer employed by the employer whose policy she sought to enjoin. *Id.* Here, although Hutchinson is still at least nominally an employee of UPS, the court has found no illegitimate disability discrimination, because Hutchinson is not disabled within the meaning of the Act.

and declaratory relief where the impermissible motive is mixed with a permissible motive, even though the plaintiff cannot prevail on his or her individual claim, because the employer has shown that it would have taken the employment action even without considering the prohibited factor of membership in the protected class.

The court has found no "mixed motive" cases under the ADA, although it knows of no analytical reason why, in the abstract, a plaintiff could not successfully mount one.[9] However, the court also finds that there is no provision in the ADA comparable to 2000e–2(m).[10] Section 42 U.S.C. § 12112, which identifies the employment practices prohibited by the ADA, certainly contains no such provision. Even were such a mixed motive cause of action available under the ADA, however, Hutchinson could not qualify for the relief under 42 U.S.C. § 2000e–5(g)(2)(B)(i). Unlike the plaintiff under Title VII who has established a mixed motive for the employer's conduct, but whose employer has successfully shown that it would have taken the same action even without regard to the impermissible factor, *Hutchinson is not a member of the protected class,* because she is not disabled, and therefore she does not have standing to assert a claim for declaratory or injunctive relief for an alleged *per se* violation of the ADA.

Thus, the court concludes that Hutchinson cannot assert her claims of *per se* violations of the ADA. UPS is therefore entitled to summary judgment on Hutchinson's claims under the ADA. The court turns next to the question of whether UPS is also entitled to summary judgment on Hutchinson's state-law claim of disability discrimination.

## C. Disability Discrimination Under Iowa Law

Hutchinson has also alleged disability discrimination in violation of Iowa Code Ch. 216. Iowa Code § 216.6 (formerly § 601A.6) makes it an unfair or discriminatory employment practice to "discharge" or "otherwise discriminate" against any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.,* 508 N.W.2d 719, 722 (Iowa 1993). The elements of a case of disability discrimination under Iowa law are that the plaintiff must prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was discharged (or suffered adverse employment decisions) because of his or her disability. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994). Thus, the *prima facie* case the plaintiff must present is as follows:

> (1) that the employee belongs to a protected group; (2) that the employee was qualified to retain the job; (3) the employee was terminated; and (4) it is more likely than not that the termination was based on an impermissible consideration.

*Miller v. Sioux Gateway Fire Dep't,* 497 N.W.2d 838, 840 (Iowa 1993) (citing *Hamer, infra* ); *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991); *Hamer v. Iowa Civil Rights Comm'n,* 472 N.W.2d 259, 264 (Iowa 1991). If the plaintiff establishes a *prima facie* case by the preponderance of the evidence, the burden then shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, non-discriminatory reason for its actions. *Smith v. ADM Feed Corp.,* 456

9. A "mixed motive" cause of action was a judicial creation: in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 240–41, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989), the Supreme Court found that the "because of such individual's ... sex" language of 42 U.S.C. § 2000e–2(a)(1), (2), did not mean *"solely* because of," but "meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." The language of the ADA prohibiting discriminatory practices also prohibits discrimination "because of the disability of such individual," and thus appears to be amenable to similar interpretation.

10. The statutory codification of the *Price Waterhouse* "mixed motive" cause of action in § 2000e–2(m) was part of the 1991 amendments to the civil rights statutes, Pub.L. 102–166, § 107(a), the same section of the 1991 Act that amended 2000e–5(g) to add (B)(i) and (ii). Although the ADA was amended at the same time by the same act, the discriminatory practices section of the ADA, 42 U.S.C. § 12112, was not amended in the same way.

N.W.2d 378, 385 (Iowa 1990).[11] The court finds that in the present case, Hutchinson has failed to generate a genuine issue of material fact that she had a protected disability under Iowa law at the time she suffered adverse employment decisions, just as she failed to meet this requirement for her federal disability discrimination claim. However, the court will consider each of the elements of Hutchinson's *prima facie* case of disability discrimination under Iowa law.

### 1. Protected disability

The threshold inquiry is whether the plaintiff can show that he or she is a disabled person subject to protection under Iowa Code § 216.6. *Miller*, 497 N.W.2d at 841; *Henkel Corp.*, 471 N.W.2d at 809; *Monson v. Iowa Civil Rights Comm'n*, 467 N.W.2d 230, 232–33 (Iowa 1991). Under Iowa law, a handicapped or disabled person is defined as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment." *Miller*, 497 N.W.2d at 841; *Henkel*, 471 N.W.2d at 810; *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 434 (Iowa 1988). Although the impairment must significantly decrease the plaintiff's ability to obtain satisfactory employment otherwise, *Henkel*, 471 N.W.2d at 810; *Probasco*, 420 N.W.2d at 436, the plaintiff need not be "almost unemployable because of [the plaintiff's] impairment to be considered disabled." *Henkel*, 471 N.W.2d at

810. Rather, the plaintiff's disability must limit one or more of the plaintiff's "major life activities," which have been defined in 161 Iowa Admin.Code § 8.26(3) as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Henkel*, 471 N.W.2d at 810; *Monson*, 467 N.W.2d at 233; 161 Iowa Admin.Code § 8.26(3). Additionally, the impairment must "disqualif[y] [the employee] from a wide range of other available jobs." *Hollinrake v. Law Enforcement Academy*, 452 N.W.2d 598, 604 (Iowa 1990).

UPS asserts that Hutchinson is not disqualified from a wide range of other available jobs, and that the proof of that assertion is the fact that Hutchinson is currently performing tasks for another employer that are very similar to those required in her employment with UPS. In *Hollinrake*, the Iowa Supreme Court reiterated the standards for the degree of impairment necessary to constitute a protected disability previously stated in *Probasco*, 420 N.W.2d 432, 436 (Iowa 1988):

> The degree to which an impairment substantially limits an individual's employment potential must be determined with reference to a number of factors: the number and type of jobs from which the impaired individual is disqualified, the geographical area in which the individual has reasonable access, and the individual's job training, experience and expectations. An impairment that interferes with an individual's

---

**11.** Thus, under Iowa law, there is no uncertainty about the application of a burden-shifting analysis or about the elements of the *prima facie* case as there was with Hutchinson's ADA claim.

Another distinction between claims of disability discrimination based on the ADA and those based on Iowa law exists in the meaning of reasonable accommodation under each act. The Iowa Supreme Court embraced the standard for accommodation of disabilities articulated by the United States Supreme Court in *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), which was specifically rejected in the legislative history of the ADA. *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 197 (Iowa 1987) ("we require a reasonable effort by the employer in carrying out [accommodation of an employee's disability]," but citing *Hardison*, the employer is not required "to bear more than a de minimis cost" in its obligation to accommodate the em-

ployee); *Frank v. American Freight Sys., Inc.*, 398 N.W.2d 797, 802–03 (Iowa 1987) (truck driver's employer was "justified in looking ahead to the situation, which the medical evidence shows to be probable, in which [the plaintiff] will not be able to do the job. In that situation, other employees would be required to fill in for him. [The plaintiff's] team driver might be required to do all of the heavy work, including the loading and lifting. To hold, as the district court did, that this would be reasonable accommodation, we believe was erroneous," citing *Hardison* for the standard for "reasonable accommodation"). The rejection of the *Hardison* standard under the ADA was discussed above at page 392. The Iowa Supreme Court has not repudiated this standard for reasonable accommodation under Iowa law since the passage of the ADA. However, this court does not reach the issue of reasonable accommodation under either the ADA or the Iowa Civil Rights Act in the present case.

ability to do a particular job but does not significantly decrease the individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.

*Hollinrake*, 452 N.W.2d at 604 (quoting *Probasco* with other citations omitted). While the plaintiff in *Hollinrake* was limited in the particular job of being a peace officer, because of deficiencies in his visual acuity, the court held that he was "not limited in any significant way from obtaining other satisfactory employment," and thus was not "truly disabled" such that he could engage the protection of the Iowa Civil Rights Act. *Id.*

 The court concludes that Hutchinson is not "disabled" within the meaning of the Iowa Civil Rights Act, because there was no evidence in the record that she is "limited in any significant way from obtaining other satisfactory employment," or disqualified from a wide range of other available jobs. To the contrary, it appears from the record that Hutchinson has obtained other satisfactory employment involving much the same tasks as she had been required to perform for UPS.

### 2. Qualified for the position

 Under Iowa law, as under federal law, whether a person is "qualified" for a position depends upon whether that person's disability can be reasonably accommodated. *Boelman*, 522 N.W.2d at 79. An employer must accommodate an employee's disability unless "the accommodation would impose an undue hardship." *Id.* (citing both 45 C.F.R. § 84.12(a) (1993), and 161 Iowa Admin.Code §§ 8.27(6), 8.28 (1993)); *Sierra*, 508 N.W.2d at 722 (Iowa Code § 216.6 requires employers to make "reasonable accommodations"); *Foods, Inc. v. Iowa Civil Rights Comm'n*, 318 N.W.2d 162, 167 (Iowa 1982). Thus, under Iowa law, a person "is qualified if [the person], with or without reasonable accommodation, 'can perform the essential functions of the position in question without endangering the health and safety of [the person] or others....'" *Id.* at 80. This standard imposes a two-prong test upon the plaintiff: (1) can the plaintiff perform the "essential functions" of the job, and (2)

whether any reasonable accommodation by the employer would enable the plaintiff to perform those functions. *Id.* To put it another way, the standard for whether a person is qualified for a job requires the court to consider "the individual's ability to perform the job in a reasonably competent and satisfactory manner given reasonable accommodation by the employer." *Henkel*, 471 N.W.2d at 810; *Cerro Gordo County Care Facility*, 401 N.W.2d at 192; 161 Iowa Admin.Code § 8.27(6).

 Neither Iowa nor federal law requires the defendant to change the essential nature of the job in order to accommodate the disabled employee's deficiencies. *Boelman*, 522 N.W.2d at 81. However, "[r]easonable accommodation by the employer may take many forms." *Sierra*, 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 197 (Iowa 1987)). "Reasonableness" is a "flexible standard" and "must be measured not only by the disabled employee's needs and desires, but also by the economic and other realities faced by the employer." *Sierra*, 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility*, 401 N.W.2d at 197). Thus, a "reasonable accommodation must be made by an employer only if it does not substantially impinge on the rights of other employees or incur more than de minimis costs to the employer." *Miller*, 497 N.W.2d at 842 (quoting *Brown v. Hy-Vee Food Stores, Inc.*, 407 N.W.2d 598, 599 (Iowa 1987)); *Smith*, 456 N.W.2d at 386; *Davenport v. City of Des Moines*, 430 N.W.2d 405, 408 (Iowa 1988). For example, where the accommodation might slow the employer's business or require the employer to hire outside employees to do the work, the accommodation comes at more than de minimis cost to the employer. *Smith*, 456 N.W.2d at 386.

 The Iowa Supreme Court recently addressed the allocation of burdens on the issue of reasonable accommodation in *Boelman v. Manson State Bank*, 522 N.W.2d 73 (Iowa 1994):

[T]he must produce enough evidence to make a facial sowing that reasonable accommodation is possible.

Upon such a showing, the burden shifts to the employer to prove that it is not able to accommodate the plaintiff's disability or that the proposed accommodation is unreasonable. An accommodation is unreasonable if it requires the employer to change the essential nature of the job or if it places undue burdens on the employer.

*Boelman,* 522 N.W.2d at 80 (citations omitted). The court reads this requirement to impose upon the plaintiff a duty to propose an accommodation before the burden shifts to the defendant to show that the proposed accommodation is unreasonable.

In the present case, Hutchinson has asserted throughout this litigation that UPS could and should have provided accommodation for her lifting restrictions, but she has not specified in what way. She refused UPS's invitation to return to work once she had received a medical clearance to lift up to 70 lbs. on the ground that she had inadequate assurances that she would have assistance lifting loads in excess of that weight. This, it appears to the court, is the nearest Hutchinson has come to articulating a specific accommodation. Because such an accommodation is already required by the current Teamsters contract, which provides that employees may obtain assistance to lift packages in excess of 70 lbs., it would seem that such an accommodation is reasonable. By the same token, it would seem that the Teamsters contract provides Hutchinson with the assurances of accommodation she seeks. Although Hutchinson has requested a reasonable accommodation, that conclusion does not overcome her failure to establish a protected disability requiring such accommodation.

### 3. Remaining elements of the prima facie case

Because the court has concluded that Hutchinson has failed to meet the threshold

element of her *prima facie* case of disability discrimination, a protected disability, the court will not reach the third and fourth elements, that Hutchinson suffered an adverse employment decision and that the employment decision "is more likely than not ... based on an impermissible consideration." *Miller,* 497 N.W.2d at 840–41.[12]

The Iowa Supreme Court has recognized that a plaintiff claiming disability discrimination has a "small target" at which to aim: the plaintiff must show that his or her "physical impairment qualifies as serious enough to bring it within the ambit of the civil rights Act, but is not so serious as to place [the plaintiff] beyond the need for reasonable accommodation by [the plaintiff's] employer." *Brown,* 407 N.W.2d at 599. Hutchinson's attempt to show a serious enough impairment has gone wide of this tiny mark.

In summary, for the same reasons Hutchinson was not "disabled" within the meaning of the ADA, she is not "disabled" within the meaning of Iowa Code Ch. 216. Hutchinson has failed to generate a genuine issue of material fact that her injuries substantially limited any major activity, or even that it impaired Hutchinson's job performance after her medical restrictions were lifted. Furthermore, nothing in the record raises a genuine issue of material fact that Hutchinson is disqualified from a wide range of other available jobs. UPS is entitled to summary judgment on Hutchinson's claim of disability discrimination brought pursuant to Iowa Code Ch. 216.

### V. CONCLUSION

The answer to the first question the court must consider in a disability discrimination case, "Is the plaintiff disabled enough to seek relief under the applicable law?", must be answered in this case in the negative.

---

12. The court regrets that the parties' efforts to settle this lawsuit did not come to fruition. The record shows that UPS initially refused to allow Hutchinson to return to work, but eventually offered Hutchinson her former position. Hutchinson then refused that offer. Whatever it may think of the merits of Hutchinson's claims in

light of these circumstances, because Hutchinson is not disabled under either the ADA or the Iowa Civil Rights Act, the court finds that it is not required to determine whether it is the conduct of UPS or of Hutchinson that leaves Hutchinson a nominal employee of UPS, but not an active one.

Hutchinson has failed to generate a material issue of fact that she is disabled as the term is defined under either the Americans With Disabilities Act or the Iowa Civil Rights Act. Hutchinson's injuries were not "minor," but the medical record demonstrates that they were temporary, and that any permanent impairment is only slight. Hutchinson acknowledges that she has now recovered sufficiently to meet the 70 lbs. unassisted lifting requirement. Furthermore, Hutchinson's impairments have not disqualified her from a wide range of jobs. Nor did UPS regard Hutchinson as disabled because UPS believed that Hutchinson was disqualified from the narrow job she had formerly performed.

Hutchinson also lacks standing to pursue equitable relief for two alleged *per se* violations of the ADA, thus the answer to the second question, "Can the plaintiff challenge certain of the employer's policies or practices alleged to be *per se* violations of the ADA?", is also negative. Hutchinson does not have standing, because she is not a person with a disability within the meaning of the ADA; therefore, she is not a person who can assert a claim under 42 U.S.C. § 12112(a), nor one who can be wronged by violation of its provisions. Furthermore, there is no real or immediate threat that Hutchinson will become such a person, and therefore she cannot generate standing. Nor can Hutchinson qualify for relief under 42 U.S.C. § 2000e–5(g)(2)(B)(i), one of the remedial provisions of Title VII incorporated into the ADA by § 12117. Unlike the plaintiff under Title VII who has established a mixed motive for the employer's conduct, but whose employer has successfully shown that it would have taken the same action even without regard to the impermissible factor, *Hutchinson is not a member of the protected class,* because she is not disabled. Therefore Hutchinson does not have standing to assert a claim for declaratory or injunctive relief for a *per se* violation of the ADA.

Because Hutchinson is not disabled under either act, and does not have standing to pursue equitable relief on her allegations of *per se* violations of the ADA. UPS's motion for summary judgment must be granted, and this matter is dismissed in its entirety.

Judgment shall be entered in favor of defendant UPS and against plaintiff Hutchinson.

**IT IS SO ORDERED.**