John RHODES, Plaintiff,

v.

BOB FLORENCE CONTRACTOR,
INC., Defendant.

No. 94–4034–SAC.

United States District Court,
D. Kansas.

May 18, 1995.

Kirk W. Lowry, Topeka, KS, for plaintiff.

Randall J. Forbes, Frieden, Haynes & Forbes, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

John Rhodes brings this action under the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., claiming that the defendant, Bob Florence Contractor, Inc., (BFC), failed to reasonably accommodate his disabilities, laid him off due to his disabilities, and failed to rehire him due to his disabilities.

This case comes before the court upon BFC's motion for summary judgment (Dk. 51). The plaintiff has filed a response and BFC has filed a reply. The court, having considered the briefs of the parties, the pretrial order, and the applicable law, is now prepared to rule.

### Summary Judgment Standards

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir.1995); *see Vega v. Kodak Caribbean, Ltd.,* 3

F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## ADA

"The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794." *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 387 (N.D. Iowa 1995). In its findings, Congress concluded that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress also found that "individuals with disabilities continually encounter various forms of discrimination,." 42 U.S.C. § 12101(a)(5). One of the purposes of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). *See Hutchinson,* 883 F.Supp. at 390 (thoroughly discussing the history of the ADA). However, "[t]he ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg,* 47 F.3d at 934. "The ADA became effective on July 26, 1992, and it does not apply retroactively." *Garcia–Paz v.* *Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

"Accordingly, to qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *White v. York Intern. Corp.,* 45 F.3d 357, 360–361 (10th Cir. 1995).

"The ADA does not define the term 'major life activities'" as used in 42 U.S.C. § 12102(2)(A). However, "[t]he ADA regulations adopt the definition of 'major life activities' found in the Rehabilitation Act regulations, 34 C.F.R. § 104." *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). "The term means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (*quoting* 29 C.F.R. § 1630.2(i)).

To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restriction in the ability to perform either a class of jobs or a broad range of

jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* 1630.2(j)(3)(i) (emphasis added). The regulations specify that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* *Bolton,* 36 F.3d at 942.

We review the record for evidence of six factors set forth in the ADA regulations. The first three factors "should be considered" when determining whether an impairment substantially limits a major life activity, 29 C.F.R. 1630.2(j)(2), and the additional three factors "may be considered" when determining whether an impairment substantially limits the major life activity of working, *id.* 1630.2(j)(3)(ii).

The three factors that "should be considered" when determining whether an impairment substantially limits a major life activity are: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* 1630.2(j)(2).

The three additional factors that "may be considered" when an individual claims substantial limitation in the major life activity of working are:

> (A) the geographical area to which the individual has reasonable access;
>
> (B) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Id.* 1630.2(j)(3)(ii).

*Bolton,* 36 F.3d at 943.

The Tenth Circuit "has endorsed a two-part analysis for determining whether a person is qualified under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, *i.e.,* functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Milton v. Scrivner, Inc.,* 53 F.3d 1118 (10th Cir.1995) (*quoting White,* 45 F.3d at 361–62) (*quoting Chandler v. City of Dallas,* 2 F.3d 1385, 1393–94 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994))).

Under the ADA the term "discriminate" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wis. Dept. of Admin.,* 44 F.3d 538, 542 (7th Cir.1995).

### Burden of Proof under the ADA

"Plaintiff has the burden to establish that he is 'disabled' and 'qualified' to perform the essential functions of the job either with or without reasonable accommodation." *Dutton v. Johnson County Bd. of County Com'rs,* 859 F.Supp. 498, 504 (D.Kan.1994); *see Tyndall v. National Educ. Centers,* 31 F.3d 209, 213 (4th Cir.1994) ("Plaintiff bears the burden of demonstrating that she could perform

the essential functions of her job with reasonable accommodation.").

Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. (citations omitted). If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 308 (5th Cir. Unit A 1981); *see Mason*, 32 F.3d at 318; *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir. 1991). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *See St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2747–49, 125 L.Ed.2d 407 (1993) (citations omitted). *White*, 45 F.3d at 361.

### Arguments of the Parties

BFC's arguments may be summarized as follows:

(1) Rhodes cannot meet his burden of establishing a prima facie case or satisfy his ultimate burden. Specifically, BFC argues:

(a) Rhodes is not "disabled" within the meaning of the ADA;

(b) Rhodes is not "otherwise qualified" within the meaning of the ADA;

(c) Rhodes cannot show that he was laid off and not rehired under any circumstance which gives rise to an inference that the decision was based upon his disability.

(2) Rhodes cannot demonstrate the existence of a genuine issue of material fact regarding the issue of whether BFC's employment decisions were pretextual.

Rhodes responds, arguing that BFC either misconstrues the facts or misapplies the law. In either event, Rhodes contends that summary judgment is inappropriate.

### Uncontroverted Facts

At the outset, the court notes that the plaintiff's response to the defendant's motion for summary judgment fails to comply with D.Kan.Rule 206 in certain respects. First, as the defendant argues, the opening section of the plaintiff's statement of controverted facts and additional facts. Many of the plaintiff's statements of fact are clearly not controverted and hence the plaintiff's inclusion of "additional" facts drifts beyond what is permitted by the rules governing his response. *See Big Tree Enterprises v. Mabrey*, No. 93–4024–SAC, 1994 WL 191996 1994 U.S.Dist.LEXIS 6403 (D.Kan. April 15, 1994). Second, and of more concern, is the plaintiff's failure on some occasions to "refer with particularity to those portions of the records upon which the opposing party relies." D.Kan.Rule 206(c). Based upon the plaintiff's failure to meet the requirements of D.Kan.Rule 206(c), the court has deemed certain facts admitted. *See* D.Kan.Rule 206(c) ("All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.").

BFC is a corporation engaged in the construction industry. BFC is a union contractor and its construction employees must be union members. Rhodes worked for BFC for fourteen years as a latherer [1]/carpenter November 21, 1978 through November 22, 1992. Rhodes was apparently a good, honest, hard worker for BFC during his tenure.

On December 13, 1990, while working for BFC, Rhodes suffered a rotator cuff tear injury to his left shoulder.[2] Surgery was performed on the shoulder. After a period

---

**1.** According to the plaintiff's brief, "the essential function of a latherer is to hang lath. Lath is basically a sheet of metal wire that looks like small chicken wire that is very light and is nailed or screwed to studs so that plasterers can then plaster the wall."

**2.** As a result of this work-related injury, Rhodes filed a workers compensation claim. On October 21, 1993, Rhodes entered an agreement settling his claim.

of rehabilitation, Rhodes was released to return to work at BFC, subject to certain restrictions, on October 10, 1991. Rhodes' treating physician placed the following restrictions upon him if he were to continue the kind of work that he was performing at BFC prior to the injury:

1. No more than 10 pounds lifting with his left arm.

2. No overhead work with his left arm.

3. No more than 30 hours of work per week.

Rhodes' treating physician rated the injury to his shoulder as "a 7% impairment to his left upper extremity."[3] As of August, 1994, Rhodes' treating physician still limited Rhodes to 30 hours per week doing the kind of work he had performed for BFC.

Upon Rhodes' return to BFC in October, 1991, BFC accommodated those restrictions by providing Rhodes with light duty work. Rhodes was assigned to work at the Lied Center project. However, because Rhodes could only work 30 hours per week, he was not able to earn the same amount of money as he had while working 40 hours per week. BFC rejected Rhodes' request to be paid above union scale; BFC would not pay Rhodes 40 hours worth of wages for working only 30 hours. Rhodes' concern that he was not earning the same amount of money as he had prior to the accident caused him to become interested in seeking vocational rehabilitation through his workers compensation case.

Based upon Rhodes' request in his workers compensation case for vocational training, on April 16, 1992, a hearing was held. During the hearing, Rhodes expressed as his tentative goal for rehabilitation was to be retrained as a respiratory therapist. On June 15, 1992, an "Order for a Vocational Rehabilitation Report" was entered in Rhodes' workers compensation case. A vocational rehabilitation specialist named Garry Gammon was hired to perform the assessment.

In August of 1992, Rhodes wanted to begin attending classes at Washburn University as a full-time student in September of 1992. On August 6, 1992, Rhodes, at the request of his attorney, was examined by a physician. That physician, Dr. Wertzberger, in a written report, commented:

> Based on consideration of his job description, his present statements, and the modifications he has made at work, I conclude that his longevity as a "Lather/Carpenter" is quite short.
>
> Vocational options should be explored in an attempt to find occupation which does not lead to significant loads upon the shoulders nor the necessity for overhead work activities.

*See* (Dk. 52), Attachment K.

On October 6, 1992, Gammon submitted the final Vocational Rehabilitation Plan. The Plan recommended that Rhodes be retrained as a medical records technician. In the plan, Gammon indicated that BFC would not accommodate Rhodes because it would not pay Rhodes for working 40 hours when he was only working 30 hours and because BFC would not guarantee, based upon the seasonal nature of its work, that it would in the future have work for Rhodes to perform.

As the Lied Center project was coming to an end, BFC assigned Rhodes to work for a few days on the construction of Talbots in Topeka. On November 27, 1992, due to the lack of work at that time and the lack of work scheduled for the future, BFC laid off Rhodes. As of November, 1992, Rhodes had lost his membership in the Carpenter's Union because he had previously stopped paying dues. As of August 1994, Rhodes had still not rejoined the Carpenter's Union. BFC was aware of the fact that Rhodes was not a member of the union. BFC informed the Carpenter's Union Business Agent that if

---

**3.** A vocational evaluation report dated February 6, 1993, was prepared by the vocational rehabilitation consultant hired by BFC's workers compensation carrier. That report indicates that based upon the "restrictions delineated in the physicians (sic) medical reports, Mr. Rhodes has lost no more than *29.71%* of his work capacity or ability to access jobs within the labor market."

The 29.71% number is based upon the following calculation: The restrictions prevent Rhodes from performing "Very Heavy" work (.71% of jobs) + "Heavy" work (8.98% of jobs) + a portion of "Medium" work (29.02% of jobs × .30% (percentage of medium jobs Rhodes can perform) = 20.02%) = 29.71%.

Rhodes ever rejoined the union and wanted to work again, to send Rhodes to BFC for employment.

Between July and December of 1992, BFC laid off approximately 59 employees. The Lied Center project was one of BFC's largest projects, and at that time BFC had approximately 60–65 employees. A large number of employees without disabilities were laid off in late 1992 due to the fact that the projects BFC had under contract were nearing completion and because of the lack of work scheduled for the future that would justify not laying the majority of its employees off. In a major layoff such as the one that occurred in 1992, BFC will, however, attempt to keep a few key employees, such as employees who run projects, employed. In that way, BFC tries to keep those key employees from being hired by other contractors.

Like Rhodes, Don Uhl was also a latherer. Uhl had more seniority with BFC than Rhodes. Uhl was laid off in late 1992 but prior to Rhodes being laid off. Uhl has no disability. Uhl was not rehired by BFC until August 25, 1993.

Prior to laying Rhodes off, BFC became aware that in the near future Rhodes intended to become a full-time student at Washburn University to be trained to work in a field other than construction. Rhodes apparently personally told employees of BFC of his intention to attend Washburn University to be retrained in something other than the construction industry.

BFC was advised by its insurance company that it would be paying for Rhodes to be a full-time student at Washburn University. On December 7, 1992, Gammon wrote Washburn University authorizing Rhodes' enrollment on January 15, 1993, and directing that the bills for books and tuition be sent to BFC's insurance company. Rhodes enrolled in 14 credit hours in the spring semester of 1993, 6 credit hours during the 1993 summer term, and 13 credit hours during the fall semester of 1993. Since the spring of 1993, Rhodes has continued to be a full-time student at Washburn University. Rhodes currently intends to complete his associates degree in medical records technology during the fall semester of 1995 and then seek employment as a medical records technician.

Since he was laid off from BFC, Rhodes has worked as a self-employed independent contractor doing lathing, installing metal studs and drivit system. Rhodes worked 25 to 40 hours per week as an independent contractor.

On August 17, 1994, Rhodes' treating physician authorized him to return to working 40 hours per week. Rhodes is presently an employee of Barnhart Drywall and Plaster, working part-time while he attends Washburn University. While employed by Barnhart Drywall and Plaster, Rhodes has been doing lathing, R-board installation, metal stud installation and ceiling installation work. During the summer, Rhodes has worked full-time.

### Analysis

**If Rhodes is "disabled" within the meaning of the ADA, has he presented evidence upon which a rational factfinder could conclude that he is entitled to recover under the ADA?**

Assuming, *arguendo,* that Rhodes is disabled,[4] the court finds that Rhodes has not

---

4. Rhodes' shoulder is undoubtedly impaired. Based upon that impairment, he has been given certain restrictions by his physician. Nevertheless, despite the physical exertion restrictions set by his physician, as a factual matter, Rhodes' shoulder injury has not prevented him from performing a broad range of construction tasks, subject to the 30 hour per week limitation. In light of this, it is far from clear that Rhodes' impairment is of sufficient magnitude to demonstrate that he is disabled within the meaning of the ADA. See Bolton, 36 F.3d at 944; Chandler, 2 F.3d at 1392 ("'An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.'") (quoting Jasany v. United States Postal Service, 755 F.2d 1244, 1249 n. 3 (6th Cir.1985); Ricks v. Xerox Corp., 877 F.Supp. 1468, 1475–76 (D.Kan. Feb. 14, 1995); Hutchinson, 883 F.Supp. at 395–96. But see 29 C.F.R. Pt. 1630, App. 1630.2(j).

On August 17, 1994, Rhodes was authorized by his treating physician to return to working 40 hours per week, apparently performing the same job that he claims his impairment prevented him from performing. At any point after that date, the court is uncertain that there is any factual

presented sufficient evidence upon which a rational factfinder could conclude that he is entitled to recover under the ADA.

## Reasonable Accommodation

■ Assuming for the moment that BFC was obligated to retain Rhodes in November of 1992, or in the alternative to rehire him at a subsequent point in time, Rhodes has not demonstrated that BFC failed to reasonably accommodate his disability. While it had sufficient work to employ Rhodes, BFC apparently accommodated Rhodes' physical exertion restrictions. The only additional accommodation Rhodes apparently sought was an increase of pay above the union scale and a guarantee from BFC that he would not be laid off. Neither of these proposals are valid or reasonable "accommodations" under the ADA.

The regulations implementing the ADA and the case law interpreting clearly support this conclusion. *See Milton,* 53 F.3d at 1124–25 ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job. *See* 29 C.F.R. Pt. 1630 App. 1630.2(*o*); *Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir.1991). An accommodation that would result in other employees having to worker (sic) harder or longer hours is not required.); 29 C.F.R. Pt. 1630, App. 1630.2(*o*) ("It should be noted that an employer is not required to promote an individual with a disability as an accommodation."). In short, the ADA did not require BFC to increase Rhodes' pay for working thirty hours per week to a rate that would make his gross pay equal to the amount he earned when he was working forty hours per week or to a rate above the amount paid other workers performing the same job. Nor was BFC required to guarantee Rhodes' employment in the future. As mentioned above, the ADA is not a job insurance policy.

## Discrimination

■ The plaintiff has failed to present sufficient evidence upon which a rational factfinder to conclude that BFC violated the ADA in laying him off or in failing to rehire him. None of the evidence presented by the plaintiff is sufficient to provide a reasonable infer-

basis to support the plaintiff's contention that he

ence that BFC's decisions to retain or rehire Rhodes were based upon Rhodes' disability.

Each of the reasons offered by BFC for its actions are legitimate and non-discriminatory and are largely unrebutted by Rhodes. No reasonable inference from the evidence demonstrates that BFC's decision to lay off Rhodes was based upon his disability. Instead, BFC's decision to lay off Rhodes was based upon the lack of work, the lack of need to retain Rhodes, and the knowledge that Rhodes was seeking a career outside the construction industry. Rhodes' personal career choices cannot serve as the basis for an ADA claim. Rhodes' current contention that he intended and expected to work for BFC for life is belied by his own actions and pursuit of a degree at Washburn University in a field other than construction. No evidence contradicts BFC's contention that the layoffs of its employees was based upon the lack of work. Rhodes' disability does not insulate him from the vagaries of the marketplace. Moreover, Rhodes knew that construction workers were on occasion laid off due to the lack of work. BFC's legitimate reasons for laying off Rhodes are basically unassailed by the evidence presented.

■ As for Rhodes' failure to rehire claim, there is no evidence that BFC has discriminated against the plaintiff. In fact, BFC's contention that it did not offer Rhodes employment because Rhodes did not apply for reemployment, because Rhodes was no longer a member of the union, and because BFC knew that Rhodes was attending Washburn University full-time in pursuit of another career is not controverted by evidence which the court may consider. Nor is BFC required at this point in time to accept Rhodes' offer of returning to work. Rhodes' offer to quit school and return to BFC is conditioned upon BFC giving a guarantee of 40 hours, no "lay offs" and no retaliation, plus back pay and attorneys' fees.

In sum, the plaintiff has not demonstrated the existence of a genuine issue of material fact precluding summary judgment.

IT IS THEREFORE ORDERED that BFC's motion for summary judgment (Dk.

is disabled.

51) is granted. The clerk of the court shall enter judgment in favor of the defendant, each party to bear its own costs.