Julianne E. WILLETT, Plaintiff,

v.

STATE OF KANSAS, Defendant.

No. 95–4052–SAC.

United States District Court,
D. Kansas.

Sept. 27, 1996.

Kirk W. Lowry, Palmer & Lowry, Topeka, KS, for plaintiff.

Jane Kelly Coates, Social & Rehabilitation Services, Office of the General Counsel, Topeka, KS, Deborah Purce–Jones, Jones & Jones, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

Julianne E. Willett brings this employment discrimination action against her former employer, the Kansas Neurological Institute (KNI), an agency of the State of Kansas, for alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et. seq.* Specifically, Willett claims that Kansas failed to reasonably accommodate her disability, systemic lupus erythematosus (lupus). According to Willett, lupus limits her major life activities of walking, grasping, pushing, pulling, going to the bathroom and working.

Willett worked as a licensed practical nurse (LPN) for KNI from January 25, 1989, until her termination on May 23, 1994. Willett claims that she was able to perform all of the essential job functions of an LPN at KNI with reasonable accommodation. The reasonable accommodation sought by Willett was (1) a lighter cart for dispensing medicine to patients and (2) to work at the Cottonwood facility, or a place with fewer ramps and requiring less walking when her lupus "flared up." KNI denies liability, arguing, *inter alia,* that it in fact provided Willett with the lighter medicine cart she requested and it offered her the opportunity to work at another unit, Honeybee North, a facility that contained no ramps and generally entailed less walking. KNI claims that Willett was fired because she could not perform the essential job functions of being present at work in a predictable fashion and not because of her disability.

This case comes before the court upon KNI's motion for summary judgment (Dk. 42). Willett has filed a response and KNI has filed a reply. The court, having considered the briefs of the parties and the applicable law, grants KNI's motion.

### Summary Judgment Standards

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will … preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v.*

*Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e)' ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 929 (7th Cir. 1995); *see Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

▪ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986),

*cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## Uncontroverted Facts

Although the court has read and reviewed all of the materials submitted by the parties and has considered all of the arguments each side has advanced, the court will make no effort to systematically address all of the points urged by the parties. In its reply brief, KNI correctly concedes that some of the uncontroverted facts that it set forth in its opening brief are immaterial to the disposition of this case. Based upon the stipulations of the parties and the relevant uncontroverted facts, the court believes it unnecessary to painstakingly sift through every aspect of the parties' respective positions. In an effort to conserve judicial resources, the court has condensed the statement of uncontroverted facts to the following and will only address the primary points necessary to its decision.

KNI is an Immediate Care Facility for mental retardation clients (ICF/MR). KNI provides residential care and treatment to approximately 300 clients. KNI employs over 700 persons, 40 of whom are Licensed Practical Nurses (LPNs). As an ICF/MR, KNI is surveyed annually for compliance with state and federal regulations. Portions of the review include a determination of whether there is a sufficient client-to-staff ratio, whether there is sufficient nursing staff to meet the medical needs of the clients and a review of medical records and monitoring of staff to determine whether there have been errors in the administration of medication to clients. Deficiencies in those areas can affect KNI's accreditation and the funding of the facility.

Willett was employed as an LPN by KNI from January 1989 until her termination in May 1994. Willett worked her first six months at the Cottonwood Building until the LPN positions at that location were transferred to other units. Willett's transfer, effective February 18, 1992, was due to a low patient census and the implementation of a strategic plan to close Cottonwood and better utilize staff elsewhere. The administration transferred all four LPN positions at Cotton-

wood to other buildings. Willett was transferred to the Honeybee Building where she worked the day shift from 6:30 a.m. to 2:30 p.m.

Willett's job duties at Cottonwood included passing medications to clients, dressing client wounds, charting, noting physicians' orders, communicating orders, assisting physicians and cleaning the treatment room. After her transfer to Honeybee her job duties remained the same except that she had the additional duty of administering tube feedings to clients.

An LPN position operates independently of other staff. Therefore, an LPN must be able to read, write and communicate effectively with clients and other team staff. An LPN must have mobility skills to be able to deliver and administer medications, treatments, first aid and/or life support services to clients wherever the clients are located. An LPN must have the physical capability to perform basic first aid and basic life support services as needed.

One of the essential functions of all LPN positions at KNI was to maintain a regular work schedule with few unplanned absences to assure the provision of client services. Frequent unpredictable, unscheduled absences of LPN's at KNI imposed hardships on KNI clients and staff. The absence of a scheduled LPN required reassignment of the nursing staff to attend to the medical needs of KNI clients. An unscheduled absence required the facility to work short-staffed, to call in other staff who were scheduled to be off, or to require staff already on duty to work overtime.

Although regular attendance was expected, during her tenure with KNI, Willett was repeatedly disciplined for absenteeism under KNI's progressive disciplinary policy.[1] In 1990, Willett was counseled by her supervisor on three occasions regarding her work attendance problems. Willett received written counseling regarding her absenteeism on

July 30, 1990, which was followed by a written reprimand on August 29, 1990. On December 12, 1990, Willett received a one-day suspension for her unacceptable pattern of absenteeism. On March 1, 1991, Willett was again suspended because of absenteeism.

In 1991, Willett began to have more frequent illness-related absences from work. In November 1992, Willett was diagnosed with systemic lupus erythematosus (lupus). Willett's symptoms included occasional pain in her hand and back and swelling in her knees. Lupus is an auto-immune disease which KNI concedes to be a recognized disability under the ADA. The day after her condition was diagnosed with lupus, Willett informed her supervisor about her disease. At that time, Willett did not request any accommodations or work modifications. Willett did not otherwise reveal her medical condition to any KNI administrators until May 1993.

On March 22, 1993, Willett was again reprimanded in writing for her excessive absenteeism. On April 28, 1993, Willett received a notice of a proposed one day suspension for absenteeism. In response to the proposed suspension, Willett wrote to Dr. Kay, KNI Superintendent, indicating that she could not control her absences due to the fact that she had lupus. In addition, Willett's treating physician wrote a letter to KNI stating that Willett had lupus and that her condition causes joint swelling and pain. Willett's treating physician also indicated that Willett needed the reasonable accommodations of a light weight cart and to be transferred to a unit that would require less walking.[2] On the basis of the information provided by Willett and her physician, the proposed suspension was withdrawn.

Apparently in response to Willett's requests, sometime after January 1, 1993, and sometime before April 30, 1993, KNI provided her with a light weight plastic cart to deliver medication to KNI clients. The light weight cart replaced a heavier metal cart.

---

1. KNI has a progressive disciplinary policy. Attendance expectations are set for in KNI's attendance policies. In the first step under the disciplinary policy, supervisors are to counsel and warn employees verbally. If the attendance problem continues, the next step is a written

reprimand followed by suspension. The last step is dismissal from employment.

2. Willett apparently requested no other accommodations.

KNI also offered to transfer Willett from Honeybee South to Honeybee North, a facility which generally involved shorter distances and generally required less walking and no ramps.[3] On June 23, 1993, Willett acknowledged to KNI that the accommodation of the light weight cart worked "great" to deliver medications. However, Willett declined the offer of the transfer to Honeybee North. Instead, Willett proposed the accommodation of being transferred to a permanent position at Cottonwood, or in the alternative a short term or temporary assignment to that facility. KNI was unwilling to make that accommodation, however, as there was no need for a full-time LPN at Cottonwood at that time. Clients at Cottonwood were provided LPN services by a "float LPN" who would administer medications and provide treatments. The float LPN would generally service the clients at the Cottonwood facility in approximately an hour, although on some days an LPN's duties would take five hours to complete. LPN's were assigned to the float position on a rotating basis although Willett was apparently not in that rotation. The LPN assigned to the float position was still required to fulfill the duties and responsibilities for treating clients in their primary unit.

In June 1993, Willett indicated that she was going to apply for the next vacant day shift position on the Medical Unit, which is also located in the Honeybee Building. On February 21, 1994, Willett received a two-day suspension from work for her continued pattern of absenteeism. Despite that discipline, Willett's absences from work continued. Additionally, during that same time frame, KNI learned that Willett had allowed her LPN license to lapse for a period of three or four days and that she had worked at KNI without a license. Willett, however, had not informed anyone at KNI that her license had lapsed. These reasons formed the basis of Dr. Day's decision to propose Willett's dismissal from employment. Willett subsequently met with KNI officials to discuss the proposed dismissal. Apparently no mutually agreeable alternative to dismissal was reached. On May 23, 1994, Willett was dismissed based upon her long history of absenteeism.

## ADA

"Enacted in 1990, the ADA is designed to level the playing field for the more than 43,000,000 Americans who have one or more physical or mental disabilities." *Schmidt v. Methodist Hosp. of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir.1996). "The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794." *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 387 (N.D.Iowa 1995). In its findings, Congress concluded that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress also found that "individuals with disabilities continually encounter various forms of discrimination." 42 U.S.C. § 12101(a)(5). One of the purposes of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). *See Hutchinson,* 883 F.Supp. at 390 (thoroughly discussing the history of the ADA). However, "[t]he ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg,* 47 F.3d at 934. "The ADA became effective on July 26, 1992, and it does not apply retroactively." *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual with a disability' means an indi-

---

**3.** To perform certain duties, however, Willett would still have to worked in Honeybee South and other locations.

vidual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

"To maintain a claim for wrongful discharge under the ADA, a plaintiff must demonstrate (1) that she is a disabled person within the meaning of the ADA; (2) that she is able to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer terminated her because of her disability." *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir.1996). *See White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995) ("Accordingly, to qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability."); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995).

"The ADA does not define the term 'major life activities'" as used in 42 U.S.C. § 12102(2)(A). However, "[t]he ADA regulations adopt the definition of 'major life activities' found in the Rehabilitation Act regulations, 34 C.F.R. § 104." *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994), *cert denied*, — U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). "The term means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id. (quoting* 29 C.F.R. § 1630.2(i)).

> To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the

average person having comparable training, skills and abilities." *Id.* 1630.2(j)(3)(i) (emphasis added). The regulations specify that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

*Bolton*, 36 F.3d at 942. *See MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437 (10th Cir.1996).

The Tenth Circuit "has endorsed a two-part analysis" for determining whether a person is qualified under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Milton*, 53 F.3d at 1123 (*quoting White*, 45 F.3d at 361–62) (*quoting Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993), *cert denied*, — U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994))).

■ Under the ADA the term "discriminate" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). *See Lowe*, 87 F.3d at 1174. "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995).

The term "reasonable accommodation" may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

### Burden of Proof under the ADA

"Plaintiff has the burden to establish that he is 'disabled' and 'qualified' to perform the essential functions of the job either with or without reasonable accommodation." *Dutton v. Johnson County Bd. of County Com'rs,* 859 F.Supp. 498, 504 (D.Kan.1994); *see Tyndall v. National Educ. Centers,* 31 F.3d 209, 213 (4th Cir.1994) ("Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation.").

Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. (citations omitted). If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 308 (5th Cir. Unit A 1981); *see Mason,* [*v. Frank* ], 32 F.3d [315] at 318 [ (8th Cir.1994) ]; *Chiari v. City of League City,* 920 F.2d 311, 318 (5th Cir.1991). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *See St. Mary's Honor Ctr. v. Hicks,* [509 U.S. 502,

506–11], 113 S.Ct. 2742, 2747–49 [125 L.Ed.2d 407] (1993) (citations omitted). *White,* 45 F.3d at 361.

### Stipulations

 A stipulation is an admission. *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1097 (10th Cir.1991). In general, parties are bound by stipulations into which they have voluntarily entered. "Stipulations of attorneys made during a trial cannot be disregarded or set aside at will." *Lyles v. American Hoist & Derrick Co.,* 614 F.2d 691, 694 (10th Cir.1980). Parties are bound by their admissions and stipulations included in the pretrial order. *Farmers State Bank of Yuma v. Harmon,* 778 F.2d 543, 545 (10th Cir.1985); *Mills v. State Farm Mut. Auto. Ins. Co.,* 827 F.2d 1418, 1422 (10th Cir.1987) (plaintiff bound by plain and unambiguous pretrial stipulation); *Air–Exec, Inc, v. Two Jacks, Inc.,* 584 F.2d 942, 944 (10th Cir. 1978).[4]

"Stipulations are not absolute, however, and may be withdrawn whenever necessary to prevent manifest injustice." *Wheeler,* 935 F.2d at 1098; *L.P.S. by Kutz v. Lamm,* 708 F.2d 537·(10th Cir.1983) (the court may relieve a party of the effect of a stipulation if the stipulation was improvident or would work a manifest injustice). "District courts consequently are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside." *Wheeler,* 935 F.2d at 1098 (citations omitted).

As discussed more fully below, the court concludes that Willett is bound by her stipulations in the pretrial order.

### Analysis

### Was Willett provided or offered reasonable accommodation?

Decocted to its simplest form, KNI's motion is premised on the following argument: KNI either provided or offered to provide the reasonable accommodations sought by Willett, and therefore it cannot be liable un-

---

**4.** In the Tenth Circuit, the "rulings of the trial court in accordance with stipulations that are clear and unambiguous will not be considered erroneous on appeal." *Mills* 827 F.2d at 1422 (citing *Lyles,* 614 F.2d at 694).

der the ADA. In her response brief, Willett disputes that she was provided the light weight cart she requested or that she was offered the Honeybee North position or that such a position was a reasonable accommodation.

### Lightweight Cart

■ Willett argues, and KNI apparently concedes, that providing a lightweight cart to deliver medications would have been a reasonable accommodation for her disability. KNI simply responds that it did in fact provide Willett with the accommodation she sought. In the pretrial order, Willett stipulates that "[p]laintiff was given a lightweight cart to use for delivery of medication prior to June 23, 1993." Based upon this stipulation and the other uncontroverted facts, no rational factfinder could conclude that KNI failed to provide Willett with the accommodation of a lightweight cart as she requested.

### Assignment Requiring Less Walking

In her brief, Willett contends that KNI failed to reasonably accommodate her disability by failing to offer to her a position which would have entailed less walking. Willett contends that she was never offered the Honeybee North position. Willett also challenges KNI's contention that the position at Honeybee North would have required less walking. Willett suggests that a position at Cottonwood would have been a more reasonable accommodation. KNI responds, arguing that Willett was in fact offered an LPN position at the Honeybee North but she rejected that position. KNI also contends that the position at Honeybee North would have required less walking than a position at Honeybee South. In regard to Willett's suggestion that she be assigned to Cottonwood, KNI points to the fact that there were no permanent LPN positions at Cottonwood, and that the ADA does not require an employer to pay a disabled person full-time wages for part time work. KNI also contends that Willett's absenteeism was an equal problem at Cottonwood, and therefore her request to be transferred to that position was not an accommodation likely to improve her

poor attendance. The court will address each point.

■ Willett's contention that "it is an issue of fact as to whether Honeybee North was ever even specifically and formally offered as a reasonable accommodation as requested" is answered by another stipulation found in the pretrial order which states: "Defendant offered to move Plaintiff to Honeybee North as an accommodation. Plaintiff refused the offer." Willett's contention that she was not offered the position at Honeybee North does not present a genuine issue of material fact precluding summary judgment.

In regard to Willett's contention that the Honeybee North position would have entailed more walking, the court has carefully reviewed Willett's deposition and affidavit and compared it to the materials submitted by KNI. Willett's conclusory opinion that Honeybee North was an unreasonable accommodation because it entailed more walking than Honeybee South is belied by the specific facts established by KNI. The court finds it ironic that the plaintiff contends that working in Honeybee North entailed more work because she was required at times to provide services to clients which would require to travel in Honeybee South, the building she claims to have required less strenuous work. Honeybee North apparently has no ramps; Honeybee South has two. Willett's contention that an LPN position at Honeybee North required more walking than an LPN position at Honeybee South is not based on the measurement of distance, but instead upon her suggestion that clients in Honeybee North were students and therefore she was required to administer medications and tube feedings while they were in class, requiring more work than for the sedentary patients in Honeybee South. However, what Willett fails to directly address is the fact that it was necessary for an LPN in Honeybee South to perform the same services for its clients attending school.[5] More importantly, Willett's unsubstantiated opinion that working at Honeybee North required more effort than working at Honeybee South is tied in part to

---

5. Willett presents no evidence, other than her conclusory opinion, to contradict KNI's contention that students in both Honeybee South and Honeybee North attended classes.

her contention that she was required to push a heavy "med cart" in Honeybee North. Willett's stipulation that she was provided a lightweight cart precludes her from advancing that argument in this or any other context. The court is satisfied that the Honeybee North position, in general, involved less walking, and that Willett has not presented sufficient facts for a rational factfinder to conclude otherwise. In short, Willett has not demonstrated that a genuine issue of fact exists regarding KNI's offer offering an LPN position at Honeybee North as a reasonable accommodation.

Nor did KNI violate the ADA by failing to honor Willett's request to assign her to the Cottonwood facility on a permanent or temporary basis. "Reasonable accommodation does not require an employer to provide literally everything the disabled employee requests." *Schmidt*, 89 F.3d at 344. Because of the limited number of clients at the Cottonwood facility, there was apparently no need for a full-time LPN on either a permanent or temporary basis. The ADA does not require an employer to pay an employee working a partial shift full-time wages, *see Rhodes v. Bob Florence Contractor, Inc.*, 890 F.Supp. 960 (D.Kan.1995), and assigning Willett to work at the Cottonwood facility would have required KNI to do just that. It also deserves mention that Willett does not assert a claim in the pretrial order that the defendant denied her the reasonable accommodation of offering her a part-time position.

Having rejected the reasonable accommodation offered by KNI, Willett is not a qualified individual with a disability within the meaning of the ADA. *See Schmidt*, 89 F.3d at 344–45 (plaintiff's failure to accept reasonable accommodations renders him unqualified under the ADA); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802 (6th Cir.1996) (plaintiff's refusal to accept available reasonable accommodations precludes her from arguing that other accommodations should have also been provided); 29 C.F.R. § 1630.9(d) ("A qualified individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.").

In sum, it appears that Willett was unable to perform an essential function of her job— regular attendance. KNI provided or offered to provide the accommodations that Willett sought. Willett was provided the lightweight medical cart she requested. Willett's rejection of the reasonable accommodation of a transfer to the Honeybee North facility precludes her recovery on that claim.

IT IS THEREFORE ORDERED that KNI's motion for summary judgment (Dk. 42) is granted. The clerk shall enter judgment in favor of the defendant.